Benedict Coal Corporation v. Commissioner.
Benedict Coal Corp. v. Commissioner
Docket Nos. 98449 and 100576.
United States Tax Court
1943 Tax Ct. Memo LEXIS 191; 2 T.C.M. (CCH) 484; T.C.M. (RIA) 43357; July 20, 1943
*191 George E. H. Goodner, Esq., Munsey Bldg., Washington, D.C., and Paul E. Schaub, Esq., for the petitioner. F. L. Van Haaften, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion KERN, Judge: These cases come up on income and excess-profits tax deficiencies, for the following years and amounts: Excess-
Income
Profits
Tax
Tax
No.
98449
1934
$ 5,006.17
1935
12,499.28
833.38
100576
1936
4,753.45
1937
2,711.74 Certain issues are eliminated by concession of the petitioner, leaving the following for consideration. (1) Whether the respondent erred in not allowing depreciation on $12,541.65 in cost of plant and equipment acquired at the time of petitioner's organization? This question was raised by amended petition. (2) Whether the respondent erred in computing allowable depreciation for the several years involved? (3) Whether respondent erred in not allowing as expense deductions the following sums for rails and mine cars: 1934
$40,883.50
1935
9.683.34
1936
$11,761.64
1937
13,540.28 (4) Whether cancellation of indebtedness by the East Tennessee National Bank in the sum of $40,000 constituted taxable income *192 in 1935 in whole or in part? (5) Whether cancellation of indebtedness by the American Bank & Trust Co. in the sum of $9,255.73 constituted taxable income in either 1935 or 1934? (6) Whether a loss sustained by petitioner on disposition of 240 shares of Holston Corporation stock in 1935 was subject to the limitation of section 117(d), Revenue Act of 1934? (7) Whether petitioner is entitled to deduct in 1935 $2,740.80 accrued by it as its liability that year under the so-called "Guffey Coal Act" but not paid before the Act was held unconstitutional? (8) Whether respondent erred in including in petitioner's net income for 1934 and 1935 the respective amounts of $591.24 and $393.89, claimed as erroneous accruals on notes of petitioner's employees? Since the issues are various we think it best to state our findings of fact on each issue separately and our opinion on the question immediately after the facts. The following facts, for the most part stipulated, are general, and may be stated here: Findings of Fact - General Facts The petitioner is a corporation, organized February 15, 1917, under the laws of the State of Virginia. Its principal place of business is St. Charles, Virginia. *193 The corporation was formed for the purpose of mining and selling bituminous coal. On or about February 16, 1917, petitioner acquired a leasehold comprising surface rights, coal, plant and equipment, and development. It paid therefor $36,500 par value of capital stock which had a fair market value at date of issuance of $36,500. The fair market value of the coal and development was $15,000, and the fair market value of the plant and equipment was $21,500 as of the date of acquisition. The estimated recoverable coal reserves on February 15, 1917 were 3,486,633 tons. The unit value for depletion purposes to return the value of $15,000 is $0.0043 per ton. The depletion allowable each year to recover the total sum is the product of the annual number of tons produced by the rate of $0.0043 per ton. During the years from 1917 through 1932, the Commissioner allowed as deductions from gross income depletion at the rate above stated of $.0043 the ton, with the result that by the end of the year 1932 petitioner had fully recovered the amount of $15,000, or the total of its cost of coal and coal development. The annual production from the coal mines of the petitioner by mines was as follows: *194 Tonnage Report, Benedict Coal Corporation
From 1917 to 1937, inclusive.
Year
No. 5 Seam
No. 7 Seam
No. 10 Seam
No. 11 Seam
No. 12 Seam
Total Tons
1917
21,643.75
21,643.75
1918
53,495.62
11,753.23
* 62,248.85
1919
22,206.80
28,195.00
50,401.80
1920
23,255.05
80,943.40
104,198.45
1921
12,424.95
112,222.15
124,647.10
1922
9,432.55
103,757.35
113,189.90
1923
26,808.70
111,618.00
138,426.70
1924
134,442.85
134,442.55
1925
144,312.25
14,979.30
159,291.55
1926
191,978.65
115,869.00
307,847.65
1927
228,997.00
281,004.45
510,001.45
1928
230,579.40
274,013.75
7,603.40
512,196.55
1929
182,921.61
180,010.00
45,493.60
408,425.21
1930
90,140.95
103,092.50
193,233.45
1931
153,247.85
238,323.00
391,570.85
1932
102,948.05
289,356.90
392,304.95
1933
169,067.85
262,546.60
431,614.45
1934
163,931.40
241,212.90
405,144.30
1935
162,178.60
265,693.30
427,871.90
1936
188,590.70
313,278.00
501,868.70
1937
177,809.10
6,729.00
307,172.00
491,710.10
*195 I. Depreciation allowable on mine equipment held on mine acquisition Findings of Fact In a brief submitted by petitioner covering the years 1918, 1919, 1920 and 1921 on the method of depreciating the fair market value of plant and equipment, or $21,500, it was suggested that the assets had a depreciable or useful life of 12 years; and pursuant thereto the Commissioner allowed depreciation on the basis suggested, deductions against the amount of $21,500 being as follows: 1918
$1,791.67
1919
1,791.67
1920
1,781.67
1921
1,761.67
1923
1,761.67
Total
$8,958.35
No other depreciation deductions have been claimed by petitioner or allowed by the Commissioner on plant and equipment acquired by petitioner in 1917. I. Opinion The stipulation of facts leaves it clear that the petitioner was entitled to depreciate the cost of its plant and equipment acquired in 1917 by exchange of its capital stock; that the portion of cost attributable to plant and equipment was $21,500; that of this sum, it had taken depreciation from 1918 to 1923, inclusive, leaving a balance undepreciated of $12,541.65, the amount now claimed; and that it took no other depreciation deductions in respect *196 of the plant and equipment first acquired. It is clear, therefore, that petitioner in ordinary circumstances would be entitled to deduct this sum by way of depreciation, and that there is no foundation for the respondent's suggestion that this sum may be a part of the unrecovered depreciation on the plant and equipment installed in the leased mine after acquisition, for the stipulated facts on this latter sum as of January 1, 1934, $670,603.45, show it to be entirely separate and distinct. In ordinary circumstances, therefore, no bar would exist to petitioner recovering the balance of its cost of original plant and equipment, but the circumstances are not ordinary. Petitioner recovered 5 years' depreciation on a suggested life of 12 years beginning on the mine's acquisition in 1917, so that the equipment would have been completely worn out on this basis by 1930. The first year now before us is 1934. There is no evidence that the mine was not in operation from 1923 to 1930, when the depreciation should have been taken; and there is no evidence that the plant and equipment are still in use and have any depreciable value. The allowance of deductions at all is only by the grace of *197 Congress, and for a taxpayer to avail himself of what is, therefore, a privilege and not a right, he must show that he comes within the purview of the statute. The statute contemplates any deduction in respect of depreciation not as a privilege standing alone which may be exercised at any time for the diminution of gross income, but as one which is tied with the production of the annual income derived from the use of the thing depreciated. Otherwise deductions could be accumulated in gross and claimed in whole or in part in any year favorable to the taxpayer, without regard to the resulting distortions of net income. If, on the other hand, the plant was idle for some years and was then put in operation again, petitioner has not shown it, for the record is silent on all but the single fact that the petitioner has a balance of unrecovered cost. The original plant and equipment to be depreciated may no longer be in existence, and from a consideration, in conjunction, of the suggested life and the years elapsed since 1917, we must suppose that it is not. To claim the deduction, the contrary should have been shown. We must, therefore, deny the deduction as to unrecovered cost of original *198 plant and equipment. II. Allowable depreciation on plant and equipment acquired after 1917 in 1934, 1935, 1936 and 1937 Findings of Fact The cost of plant and equipment installed on the leased mine from February 15, 1917 to January 1, 1934 and charged to capital account on the books of petitioner and on which depreciation has been claimed by petitioner and allowed by the Commissioner at the rate of 8.33 per cent per annum is $1,569,225.04; the amount of depreciation claimed by petitioner and allowed by the Commissioner during this period is $898,648.59, leaving a remaining unrecovered cost of plant and equipment on January 1, 1934, to be returned through depreciation of $670,503.45. On November 1, 1936 the petitioner in a letter signed by its general manager to a representative of the Bureau of the Internal Revenue indicated that the recoverable tonnage in Mines 7 and 12 amounted to $3,809.959 tons as of January 1, 1934 and that the remaining depreciable life of the plant and equipment from that date was 9-3/10 years. This estimate was erroneously increased in the amount of recoverable coal by 560,429 tons by reason of the inclusion of coal under lands not then *199 under lease but which were later acquired. The error in tonnage shown in the letter to the Bureau of Internal Revenue was noticed by the petitioner's officers one month after its mailing to the Bureau. Both Mines Nos. 7 and 12 were still in existence and being operated on May 11, 1942, the day of the case's trial, although Mine No. 12, it was estimated, would probably be exhausted by June 1942. It was unknown how long Mine No. 7 would continue to operate. Additional acreage was acquired in 1940, which when mined, will be mined from the No. 7 tipple. The "unit" method of production for computing depreciation has never been used by the petitioner corporation. The company has used but one system, the "straight line" method. The petitioner has never requested permission from the Commissioner of Internal Revenue to use any other method of computing depreciation. The Commissioner in the notices of deficiency for the taxable years involved has computed the depreciation on the plan and equipment on a remaining life from January 1, 1934 of 9-3/10 years, using the straight line method. II. Opinion The question here involved is the method of depreciation to be applied to the plant and equipment *200 acquired after 1917, and the normal life of that equipment. Petitioner contends for the "unit" method of depreciation, based on the tonnage of coal removed, or in the alternative, for a shorter life on the ground that the estimated tonnage reported in 1936 was erroneously over-stated. The unrecovered balance of cost of petitioner's equipment has been stipulated and is not in issue. The petitioner deducted depreciation before the years here involved at the rate of.0833 per cent per annum, or on a prospective life of 12 years. Beginning on January 1, 1934 the respondent has used a remaining life of 9.3 years, which the petitioner complains is too long a life; and has allowed deductions on the so-called "straight line" method, that is to say, the same amount each year. It appears that petitioner has always used the straight line method, and has never, as the Treasury Regulations require, asked permission to take its depreciation otherwise. [1] It has not been shown that any distortion results from using that method, and there may even be an advantage to the petitioner in its use, since depreciation goes on during strikes when the machinery is not in use. So at least the petitioner's *201 president, Darst, testified, although possibly the rate of depreciation would not be so fast. We see in reason, therefore, to alter the method of calculating the depreciation. The respondent's presently applied life of 9.3 years was adopted after the Internal Revenue agent received a letter on November 1, 1936 from petitioner's general manager, which was put in evidence, and which concluded as follows: The figures as shown in Tons Reserve as of January 1st, 1934, in both Mines is 3,809,959 Tons, and the yearly rate of Extraction from Both Mines as 451,756 tons, giving this property a life of 9.03 Years. This admittedly now was an erroneous statement, for the general manager included in the calculation a tract of land not then owned by petitioner but which it later acquired and mined. The error resulted in the inclusion of 560,429 tons. Petitioner's officers noticed the error within *202 a month but made no motion to correct it. The additional land was acquired in 1940 and being adjacent to No. 7 Seam, is mined from that seam's tipple. At the hearing petitioner put in evidence, which need not be recapitulated here, to the effect that the average life of the two seams as of December 31, 1936 was 4.84 years. Respondent urges that the No. 12 Seam was still being worked in 1942 and that, although No. 7 Seam was then about exhausted, no segregation of machinery having been made, we must suppose that the average life was even more than 9.3 years. We are of the opinion, however, that petitioner is essentially correct in its contention. Hindsight is usually better than foresight, but it is the probable life as of January 1, 1934 that we must reckon. Ithaca Trust Co. v. United States, 279 U.S. 151. We think it fairly obvious that the respondent adopted the petitioner's erroneous computation of November 1, 1936. A recomputation should be made which will leave out of account the 560,429 tons then erroneously included. This will give the probable life of the machinery as of that date (which respondent is apparently willing to accept as of January *203 1, 1934). Depreciation on after-acquired equipment will be recomputed, therefore, as above set out. III. Expenditures for mine cars and rails Findings of Fact During the years 1934 and 1935 petitioner expended $65,250.83 and $26,550.73, respectively, for plant and equipment of which $28,550.36 was spent in 1934 for mine cars and $12,333.14 for mine rails and $3,411.98 was spent in 1935 for mine cars and $6,271.36 for mine rails. The entire expenditures were charged to the capital account on the books of petitioner and depreciation was deducted on them in the Federal tax returns and the Commissioner allowed depreciation on them in the notices of deficiency for the years 1934, 1935, 1936 and 1937. During the years 1936 and 1937 petitioner expended $29,677.58 and $91,155.29, respectively, for plant and equipment. Of these amounts $11,771.64 was spent in 1936 for mine rails, mine cars, and the repair of tracks, and $13,540 was spent in 1937 for mine rails and mine cars. These expenditures were charged to the capital account on the books of petitioner and depreciation was deducted on them in the Federal tax return and the Commissioner allowed depreciation on them in the notice *204 of deficiency for the years 1936 and 1937. These expenditures for mine rails, mine cars and the repair of tracks were made to enable petitioner to maintain its rate of production of coal from parts of its mine which had passed from the development stage. As the work in the seams advanced farther from the entires, the tracks had to be extended to reach the working faces and more cars were required to haul the same quantity of coal. The expenditures did not reduce the cost of producing coal and did not add to the value of the property. As the mine was depleted, its value grew less. Petitioner's total expenditures for plant and equipment in the years 1927 to 1933, inclusive, were as follows: 1927
$132,043.04
1928
92,512.30
1929
147,351.60
1930
258,066.54
1931
30,702.25
1932
31,000.16
1933
36,731.05
Those for mine cars and mine rails were as follows: 1927
1928
1929
1930
1931
1932
T Rail
$19,674.72
$11,760.01
$13,007.13
$4,490.28
$ 952.94
$ 17.28
No. 10 Mine Cars
21,580.74
#7 Mine Cars
6,535.07
#12 Mine Cars
3,743.94
9,335.75
199.29
R & R Mine Cars
541.47
6,245.33
2,614.86
R & R Tracks
701.68
#12 Ky. Tramway
8,589.26
*205 1933
T Rail
$6,651.16
No. 10 Mine Cars
#7 Mine Cars
#12 Mine Cars
R & R Mine Cars
3,555.20
R & R Tracks
#12 Ky. Tramway
1,126.88
During the period 1917 to 1933, inclusive, no expenditures made by petitioner for mine cars and mine rails (T Rails) were charged to expense. III. Opinion The question here is whether expenditures for mine cars and rails may be deducted as expenses in the years 1934 to 1937, inclusive, or must be returned as capital expenditures to be depreciated. The petitioner treated them as a capital expenditure from its beginning in 1917 through the years in question, but now claims them as an expense. The rule has been long settled in three circuits, including the 4th, in which the present case arises, that after the period of development and during that of operation of a coal mine, expenditures for rails and cars and the like used in maintenance of production are, contrary to the general rule that machinery with a life longer than a year is to be depreciated as capital, to be allowed as expenses in the year of purchase. United States v. Roden Coal Co., 39 Fed. (2d) 425 (5th Cir.); Marsh Fork Coal Co. v. Lucas, 42 Fed. (2d) 83 *206 (4th Cir.); Commissioner v. Brier Hill Collieries, 50 Fed. (2d) 777 (6th Cir.). Parker, J. in the Marsh Fork Coal Co. case, supra, pointed out that this practice of accounting in collieries obtains both in this country and England for the reason that ordinarily the increase of machinery in a coal mine does not add to the value of the mine, but, on the contrary, reaches its highest peak at the moment when the mine reaches depletion. He there said, at p. 84: At the time of the expenditures, petitioner's mines had been fully developed, and had been operated for a number of years. Workings had reached a distance of one and one-half miles from the head house, and more cars, locomotives, and trackage were necessary to maintain the normal output. The normal life of all of the equipment purchased exceeded one year, that of the cars being about five years, and that of the electric locomotives from eight to ten years. Petitioner contends that, although this is true, the purchase of the equipment did not add, and was not intended to add, anything to the value of the mining property, that its purchase was made necessary by the removal of the coal and *207 the recession of the working faces; and that its installation was nothing more than an expense incident to the removal of the coal. We agree with the contention of petitioner. * * * * *
Ordinarily it is true that the purchase of machinery having a life greater than one year is to be charged to capital and not to expense, for ordinarily such machinery is purchased either to increase production or to decrease cost and in either event to add to the value of the property. Expenditures such as those here involved, however, are not made either to increase production or to decrease cost of operation. They do not add to the value of the property, and are not made for that purpose. They are made solely for the purpose of maintaining the capacity of the mine as the working faces of the coal recede. They represent the cost, as it were, of bringing forward the working plant of the operator, which is made necessary as the coal is removed from the mine and the tunnels increase in length. The Treasury Regulations under the 1918 Revenue Act considered in those cases is in no substantial sense different from the Regulations now applicable. [2] Petitioner's president, Darst, testified that the mine *208 cars and rails were to maintain production, and that their installation did not reduce the cost of production, and that the mine was nearing depletion. Respondent asks us to discount this testimony on the ground that the witness on cross-examination showed some confusion, but even if the testimony is barred altogether, it seems wholly reasonable to assume that a mine after 17 years' operation has passed its development stage and that additional trackage and cars would be necessary to maintain prodouction from receding coal faces. The evidence shows that one seam, in fact, would be probably wholly depleted by 1942, 8 years after the first year, 1934, here involved. Respondent's allowance of depreciation on petitioner's plant and equipment for the years involved would indicate, in fact, that he thought that the development stage was past. We think that we may safely make that assumption, and can find no other serious objection to allowing petitioner, although belated claiming his right, to deduct these expenditures currently as expenses. We so hold. Equity and the terms of the stipulation preclude, of course, the deduction of this equipment or of any other involved in the case both *209 as depreciated capital and as a current expense. Therefore, the amounts of these expenditures should be excluded from additions to plant and equipment, and no depreciation should be allowed thereon. *210 IV. Cancellation of $25,000 indebtedness by the East Tennessee National Bank in 1935 Findings of Fact Sometime prior to November 16, 1933 the petitioner had become indebted to the East Tennessee National Bank to the extent of $140,000 payable in five notes all of which were then past due. On November 16, 1933 the petitioner entered into an agreement with the receiver of that bank as a result of which the petitioner's liability was reduced to $100,000 payable as follows: November 16, 1933
$25,000
December 16, 1933
25,000
March 16, 1934
12,500
July 16, 1934
12,500
November 16, 1934
12,500
March 16, 1935
12,500
The agreement further provided that if the petitioner corporation should default in the payments called for in the above agreement, the entire balance remaining of the original indebtedness, in the sum of $140,000 should revert to its original status and become collectible in full. This condition is set forth as follows: (2) Upon the full and unconditional compliance with the paragraph hereof last above preceding, - that is, condition (1) hereof, the Party of the First Part [Bank Receiver] agrees for himself, his successors and assigns, to gain repossession *211 of said notes totaling One Hundred and Forty Thousand ($140,000.00) Dollars from the respective pledgees and to surrender them to the Party of the Second Part hereto; - but if default be made in the payments provided for in the first condition hereof, then each and all payments made prior to the date of such default, shall operate as a credit upon the entire obligation of One Hundred and Forty Thousand ($140,000.00) Dollars, and the entire balance so remaining (of the $140,000.00) shall be reverted to its original status and collectible in full with interest and attorney's fees as in the original notes provided, at the option of the respective holders thereof; - and should the Party of the Second Part at the instance, direct or indirect, of any person, firm or corporation whether or not a party hereto, be forced or placed in liquidation, or should the Party of the Second Part hereto voluntarily begin liquidation, then the original indebtedness reverts to its former status with such payment, or payments, as may have been made pursuant to this agreement, operating as a credit, or credits, upon the original obligations totaling One Hundred and Forty Thousand ($140,000.00) Dollars, and *212 the Party of the First Part, his assigns or successors, reserves and are granted the right to prove their claim and ratably share in the original amount, less the credits paid in cash pursuant to his agreement, if any. The receiver for the bank had pledged the notes and the pledgees were unwilling to agree to the arrangement unless $15,000 more should be paid. Accordingly, this agreement was modified by increasing the sum compounded for by an additional $15,000 which was to be paid by petitioner's officers. Guy Darst and Calvin Holmes. A note was then given by the petitioner, endorsed by Darst and Holmes. The settlement as modified was approved by the court on November 18, 1933. The terms of the original contract of November 16, 1933 were carried out and payments made as follows: Cash upon execution of agree-
ment
$25,000
December 9, 1933
25,000
March 16, 1934
12,500
June 13, 1934
5,000
July 2, 1934
7,500
November 16, 1934
12,500
March 16, 1935
12,500
Total
$100,000 Each note referred to had included as a part of it by reference the agreement of November 16, 1933. The $15,000 note was made petitioner payable to, and endorsed by, Holmes and Darst, November 16, 1933. *213 The $15,000 note was paid by the petitioner, $10,000 on October 4, 1935, and $5,000 on November 4, 1935, and on December 31, 1933, the petitioner credited on its books $25,000 to profit and loss as the result of the transaction with the receiver for the East Tennessee National Bank. There was no credit to surplus in 1934 or 1935. The petitioner corporation is still in existence today. The financial position of petitioner during the calendar year next succeeding the compounding of its debt above on November 16, 1933, as shown by its balance sheets, was as follows: December 31, 1933
Current assets
$152,899.93
Fixed assets
816,683.71
Current liabilities
256,432.83
Long term liabilities
250,800.00
December 31, 1934
Current assets
$180,625.21
Fixed assets
770,549.20
Current liabilities
227,977.59
Long term liabilities
240,700.00
December 31, 1935
Current assets
$177,991.56
Fixed assets
682,597.99
Current liabilities
149,526.07
Long term liabilities
209,500.00
IV. Opinion On the authority of Helvering v. American Dental Co., 318 U.S. 322, this issue is decided for petitioner. The cancellation of the indebtedness of petitioner *214 did not constitute income to petitioner in any amount or any year. V. Cancellation of indebtedness of $9,295.73 by American Bank & Trust Co. in 1935. Findings of Fact In 1933 petitioner became indebted in the amount of $30,000 to the American Bank & Trust Co. of Richmond, Virginia. Early in 1934 petitioner's president negotiated a reduction of that indebtedness, by the terms of which the receivers of said bank agreed to take the amount of $21,428.57 in settlement of said debt. On February 10, 1934, petitioner paid $5,357.15 in cash and gave five notes totaling $16,053.42 due in 30 days, 4, months, 8 months, 12 months, and 16 months, respectively, in full settlement of the $30,000 debt and accrued interest thereon. All of said notes were paid as they became due. On February 28, 1934, petitioner entered the cancellation of indebtedness on its books as a debit to notes payable in the amount of $8,571.43 and a credit to general loss and gain in the same amount. On the same date petitioner made an entry debiting accrued interest in the amount of $684.30 representing unpaid interest on the forgiven indebtedness, and crediting general loss and gain in the same amount. Petitioner *215 reported the amount of $9,255.73 as an addition to surplus in its income tax return for 1934. Petitioner's indebtedness to the American Bank & Trust Co. was cancelled in the amount of $9,255.73 in 1934. Respondent determined that petitioner realized income in 1935 from the cancellation of the aforesaid indebtedness in the amount of $9,255.73. By amended answer respondent had asked that, if the Board finds that the cancellation of indebtedness was a completed transaction in 1934, the amount of $9,259.73 [$9,255.73] be added to income for 1934. V. Opinion This issue is also decided in favor of petitioner on the authority of Helvering v. American Dental Co., supra. VI. Was the loss on Holston Corporation shares in 1935 a capital loss limited by section 117(d)? Findings of Fact About 1930, petitioner, Holmes-Darst Sales Agency and three other coal mines formed the Holston Corporation, each subscribing $24,000 for 1/5 of its stock. The purpose of this corporation was to facilitate and stimulate the sale of coal to small dealers during the dull months of spring and summer. The financing of the new corporation was done by borrowing $400,000 from *216 a Cleveland bank, each of the five stockholders endorsing the note of Holston to the extent of 1/5 of its face value, or for $80,000 each. The debt became due at the end of the first year and the bank wanted it paid then. The Holsten Corporation, not being able to pay the entire amount, then borrowed from John R. Shindell $57,000, which was the sum necessary to make up the amount required in order to pay in full the Cleveland bank in October 1932. The five endorsers were thus relieved of their liability to the bank, but became in turn liable for a sum not to exceed $12,000 each to Shindell. In 1933, the situation growing worse, the Holmes-Darst Corporation, which had a sale organization parallel to that of Holston, and which was Holston's largest creditor, took over the management of Holston. In 1935, the situation being very bad, Shindell demanded full payment. By that time the Holston Corporation had reduced the amount which it owed to Shindell to $28,118.02, which was all it owed; and each of the five stockholder-endorsers paid Shindell cash to the extent of 1/5 of that amount, or $5,623.50. Petitioner at the same time turned over its stock in Holston to Shindell for the purpose *217 of facilitating the liquidation of Holston, and got nothing in return. Before Shindell was paid the five stockholders had agreed to turn over their equity in the Holston Corporation to the Holmes-Darst Corporation. On July 31, 1935 Holston, with a capital of $120,000, had a deficit of $136,156.44, its assets consisting of only of its accounts and yards which were decreasing in value rapidly. The stock was worthless. The Holmes-Darst Corporation was very much interested, since it was the biggest creditor of Holston Corporation and in August 1935, it took over the assets and assumed the liabilities of the Holston Corporation and subsequently lost $90,000 by doing so. In petitioner's return for the taxable year 1935 it deducted a cash payment in the amount of $5,623.60, and also the total cost of the stock of the Holston Corporation amounting to $24,000. The Commissioner in the notice of deficiency had disallowed the amount of $21,310 composed of the following adjustments: Cost of stock
$24,000
Loss limited to
2,000
Excessive loss
$22,000
Less: "Profit on purchase of com-
pany's own bonds" (State-
ment of operations, calendar
year 1935; joint Exhibit 8-D)
690.00
Amount disallowed
$21,310.00
*218 The $5,623.60 paid to Shindell has been allowed as a deduction for income tax purposes and is not in dispute here. VI. Opinion The only question here is whether petitioner received anything in exchange for its Holston Corporation stock when it paid its share, as endorser, of the debt owed by that corporation to one Shindell, and at the same time surrendered to him its $24,000 worth of Holston stock, which was then worthless. If it did not, the transaction is not limited by the capital gain provision, section 117(d), Revenue Act of 1934. [2] We think that the evidence, although not as clear as it might be, does not show any capital exchange and that the limitation on loss does not, therefore, apply. *219 It should be noted that petitioner, as respondent points out, has claimed the full $22,000 of its stock loss above the $2,000 already allowed by respondent under the limitation of section 117 (d). This is obviously error, for petitioner in its return reported capital gains of $690; so that only $21,310 is allowable. No question arises on the deduction, already allowed, of the $5,623.60, representing the sum paid by petitioner to Shindell as one of five endorsers on Holston's note. It is unnecessary to deal at length with the evidence. The petitioner and four other coal-mining companies, including a sale agency, Holmes-Darst, organized a company in 1930, which was expected to relieve the situation of coal companies in the "off" season of the spring and summer months. Large loans were made to it, which were guaranteed by the several stockholders as endorsers, and these were all paid off, in part by new borrowing, and finally by the five endorsers raising the necessary cash, $28,115.02, in 1935, to satisfy Shindell, Holston's last creditor. Holston in these 5 years had gone from bad to worse, and no controversy exists on the value of the stock surendered by petitioner to Shindell, *220 which was admittedly worthless at the time. The only question is whether petitioner got anything for this surrender, and the respondent's suspicion that this was so seems to center on the fact that Holmes-Darst Corporation, as the largest creditor, took over Holston's assets and assumed its liabilities in August 1935. It later lost about $90,000 by the transaction. Petitioner's president, Darst, testified categorically that petitioner got nothing in exchange for its Holston stock and we can not find that it did. The reason why it surrendered the stock to Shindell when it paid him its share of Holston's debt was "so that he could liquidate" Holston. The books of Holston were kept in Shindell's office and it appears that he was not only a creditor but was also acting for it. It would appear likely that petitioner at the time its last liability on account of Holston was paid was anxious to rid itself of any further connection with Holston and gave the stock to Shindell so that he could more easily arrange for Holston's corporate death. If petitioner wished to get rid of stock then confessedly worthless by giving it away, it does not justify us in holding that the gift was an exchange. *221 We hold that the section 117 (d) is not applicable to the loss in the circumstances. VII. Whether petitioner may deduct in 1935 Guffey Coal Tax accrued in that year but never paid? Findings of Fact The amount of $2,740.80 was accrued on the books of the corporation at the end of the year 1935 on account of its claimed tax liability under the so-called Guffey Coal Act, but was not paid. In the following year the Guffey Coal Act was held by the Supreme Court to be unconstitutional, and this amount was credited to surplus. The amount of $2,740.80 when reversed on petitioner's books in 1936 was not included in that year for income tax purposes. VII. Opinion The petitioner accrued its Guffey Coal Tax for 1935, but never paid it. On May 18, 1936 the Act of Congress laying the tax was held unconstitutional by the United States Supreme Court. Thereupon the account representing this accrued but unpaid tax was reversed and the amount was credited to surplus. Both the years 1935 and 1936 are before us in this proceeding. It is obvious that the facts of this case are in all respects similar as to this issue to the facts in Athens Roller Mills, Inc., 46 B.T.A. 1012. *222 On the authority of that case we decided this issue in favor of respondent. VIII. Whether deduction of $591.24 in 1934 and of $393.89 in 1935 for interest accruals were allowable? Findings of Fact Sometime before 1934 certain stockholders of the petitioner who were also its employees became indebted to banks in Knoxville, Tennessee, that subsequently failed, with their assets going into the hands of the Reconstruction Finance Corporation. The petitioner did not want these employees to lose their equity in its stock which had apparently been pledged as collateral for these notes, or a deficiency judgment to be entered against them; and so bought the notes, which were interest-bearing, from the Reconstruction Finance Corporation. The principal amounts of the notes acquired by the petitioner and the employee-makers were as follows: St. John Rentals
$2,000
Ella M. Davis
3,000
J. O., J. H., and G. A. Caldwell
1,875
Lulu Long
480
F. L. Darst
2,500 All but Caldwell were employees of petitioner. In 1934 the interest accrued on the notes on the books of the petitioner amounted to $591.24. In 1935 the interest accrued on the notes amounted to $393.89. *223 Petitioner included these amounts of accrued interest in its income as reported for these years. In 1936 the balance of accrued interest on the books of petitioner was $3,165.38, being the total interest accrued to August 31, 1935, and was charged off to profit and loss in that year as a bad debt. This amount was claimed as a deduction in the return of the petitioner for the year 1936 and subsequently disallowed by the Commissioner in his notice of deficiency. The account was charged to profit and loss on the direction of the president of the petitioner corporation. The officers of petitioner did not intend that interest on these notes should be collected from the employees or that such interest be accrued on petitioner's books. Petitioner now contends that these interest items were not properly income during the taxable years. VIII. Opinion The petitioner originally claimed $3,165.38 as a bad debt in 1936 on the basis of its auditor's treatment of this sum on its books, which represented the balance of accrued interest on its books from notes made by its employees and later bought by it. The claim was disallowed by respondent and petitioner now waived its claim for the bad debt *224 deduction but by an amendment to its petition alleges error on respondent's part in including in its gross income for 1934 and 1935 the sum accrued on its books in those years as interest on these notes. Petitioner had no intention, as its president testifies, to charge its employee-stockholders interest on these notes, but merely to hold them, until their equity in the stock could be paid for. This testimony is unequivocal and uncontradicted. However, there is no evidence that this intention was communicated to the makers of the notes, or that there was any agreement between them and petitioner to the effect that interest should not be charged; and the petitioner's auditor set up the interest as an accrued item of income on its books. The petitioner now denies that the interest in the circumstances was income in the years when accrued. We are of the opinion that these interest items constituted income to the petitioner for the years when accrued. There is no showing that the makers of the notes were not legally obligated to pay interest thereon during the taxable years, or of any other fact which would relieve petitioner from accruing this interest as income. The mere fact that *225 petitioner's president or other officers did not intend to collect the interest did not make the interest uncollectible, or invalidate the obligation of the makers of the notes to pay interest. By waiving the collection of interest under the circumstances here shown, petitioner may have in effect made gifts of the sums waived to the various obligors, but should not on that account be relieved from first including the interest items waived in its income for the years in question. Judgment will be entered under Rule 50. Footnotes
*. This figure is obviously the result of an error in addition, but is stipulated by the parties.↩
1. REGULATIONS 86 ART. 23 (m)-11. Depletion and depreciation accounts on books. - If the plan or method of depletion and depreciation accounting adopted by the taxpayer has once been approved by the Commissioner, it can not be changed by the taxpayer without the consent of the Commissioner. * * *↩
2. REGULATIONS 86 ART. 23 (m)-15. Allowable capital additions in case of mines. - (a) All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage. The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining. (b) Expenditures for plant and equipment and for replacements, not including expenditures for maintenance and for ordinary and necessary repairs, shall ordinarily be charged to capital account recoverable through depreciation. Expenditures for equipment (including its installation and housing) and for replacements thereof, which are necessary to maintain the normal output solely because of the recession of the working faces of the mine, and which (1) do not increase the value of the mine, or (2) do not decrease the cost of production of mineral units, or (3) do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made, shall be deducted as ordinary and necessary business expenses.↩
2. Section 117 (d)↩ - LIMITATION ON CAPITAL LOSSES. - Losses from sales or exchanges of capital assets shall be allowed only to the extent of $2,000 plus the gains from such sales or exchanges. If a bank or trust company incorporated under the laws of the United States or of any State or Territory, a substantial part of whose business is the receipt of deposits, sells any bond, debenture, note, or certificate or other evidence of indebtedness issued by any corporation (including one issued by a government or political subdivision thereof), with interest coupons or in registered form, any loss resulting from such sale (except such portion of the loss as does not exceed the amount, if any, by which the adjusted basis of such instrument exceeds the par or face value thereof) shall not be subject to the foregoing limitation and shall not be included in determining the applicability of such limitation to other losses.